| | |
|---|---|
| CLINTON CATO and MARY JO CATO, | Civil Action No. |
| Plaintiffs, | 16-4605 (SDW) (LDW) |
| v. | **MEMORANDUM OPINION** |
| THE TOWNSHIP OF ANDOVER *et al.*, | **AND ORDER** |
| Defendants. | |

**LEDA DUNN WETTRE, U.S.M.J.**

Before the Court is plaintiffs' application for the Court to permit a "nurse observer" or another third party to attend their psychological examinations by defendants' medical expert. ECF No. 26. For the reasons set forth below, the Court holds that neither a nurse observer nor plaintiffs' counsel may be present in the examination room during the plaintiffs' psychological examinations and that plaintiffs also may not audio-record their examinations.

## BACKGROUND

This is a federal civil rights action, pursuant to 42 U.S.C. §§ 1983 and 1988. Jurisdiction is premised upon a federal question under 28 USC § 1331. Plaintiffs also assert claims under the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1, *et seq.*, and the New Jersey Constitution, over which this Court has supplemental jurisdiction, 28 U.S.C. § 1367.

Plaintiffs are husband and wife. Complaint ¶ 4 (ECF No. 1). Their lawsuit is based upon interactions with their neighbors and police that occurred on their property in Andover, New Jersey on the night of July 20, 2015. Plaintiffs aver that Mr. Cato is "black" and Mrs. Cato is "white." *Id.* Plaintiffs allege that their neighbor George Morehouse and his friend James Dunnigan

approached Mr. Cato on the Cato property that night, threatening physical harm to Mr. Cato and yelling racial epithets at him. *Id.* ¶¶ 18-22. Allegedly in response to this threat, Mr. Cato discharged pepper-spray at Morehouse. *Id.* ¶ 23. Morehouse and Dunnigan then retreated from the Cato property. *Id.* Plaintiffs allege on information and belief that Morehouse or his wife then called the police, asserting erroneously that Morehouse had been shot in the head by Mr. Cato. *Id.* ¶ 27. Police from the neighboring towns of Andover, Newton and Sparta, as well as a New Jersey State Police helicopter, were dispatched to the scene. *Id.* ¶¶ 28-29.

Members of the Andover Police Department, upon arriving at the Cato property and encountering Mr. Cato outside the house, allegedly pointed their firearms at Mr. Cato and asked if he was armed. *Id.* ¶¶ 33-35. When Mr. Cato responded affirmatively, the officers asked Mr. Cato to drop his firearm, and he complied. *Id.* Mr. Cato was then handcuffed by the police, and objected to the same, allegedly resulting in their replying to the effect that he ought not to complain because he "just shot somebody up." *Id.* ¶¶ 36-37. Mrs. Cato then emerged from the house, causing the police to shout at her not to advance towards them and demanding to know what was in her hand; she replied that she was not carrying anything. *Id.* ¶ 40. Mrs. Cato and the Catos' children were then allegedly "detained" outside of their home for the next four hours. *Id.* ¶ 41. Mr. Cato was taken to the police station and released in the early morning hours. *Id.* ¶¶ 66, 75.

The Catos essentially complain of the manner in which they were treated by the police during the investigation of the incident.[1] They assert in an eighteen count Complaint that various police officials, the Andover and Newton Police Departments, and the Townships of Andover and

---

[1]      There is also a separate action in the Superior Court of New Jersey, Sussex County, Law Division between plaintiffs and their neighbors, captioned *Morehouse v. Cato*, Docket No. SSX-L-690-15. *See* ECF No. 13.

Newton violated the United States and New Jersey Constitutions, as well as 42 U.S.C. §§ 1983, 1988, and the New Jersey Civil Rights Act, N.J.S.A. § 10:6-1, *et seq*. ECF No. 1. The Complaint alleges that the individually named defendants violated their civil rights by way of false arrest, false imprisonment, use of excessive force, and unreasonable search and seizure. The Complaint further alleges, *inter alia*, that the Townships of Andover and Newton had policies, customs, and practices of failing to supervise and train its employees resulting in injuries to plaintiffs. Among the damages plaintiffs reportedly sustained are psychological injuries, including post-traumatic stress disorder ("PTSD"). ECF No. 28 n.1.

Defendants arranged to have the plaintiffs' psychological condition examined by their own expert, Joel E. Morgan, Ph.D., a Board certified psychologist licensed to practice in the State of New Jersey. *See* ECF Nos. 28, 28-1. On the date of Mr. Cato's examination by Dr. Morgan, defendants' counsel telephoned the undersigned to inform the Court of Mr. Cato's intention to bring to the examination a third party nurse observer without any prior notice to or agreement with defendants' counsel or Dr. Morgan. *See also* ECF No. 28-1 ¶ 3. Defendants' counsel reported that he and Dr. Morgan objected to having the examination conducted with the third party nurse observer present. The Court ordered that the examination be suspended until the parties' counsel could submit their respective written positions on the permissibility of plaintiffs' nurse observer being present during the defense medical examinations. *See* ECF No. 25. Those submissions were subsequently made by counsel. *See* ECF Nos. 26, 28.[2]

---

[2]     The Court has not considered surreply letters recently submitted by the parties (ECF Nos. 29, 31, 32, 33), as they were submitted without Court leave and after the Court already had reached its decision based on the prior letters.

3

## DISCUSSION

### A. The Parties' Positions

Plaintiffs' letter application requests that the Court permit a nurse observer, or alternatively their counsel or a recording device, to be present during the psychological examinations by defendants' medical expert. *See* ECF No. 26. They contend that a defense medical examination is inherently adversarial and requires proper safeguards to avoid providing the defense with "unfettered access under the guise of independence." *Id.* at 3. Their concerns are particularly heightened by the intention of the defense expert to conduct the examination of each plaintiff over an entire day, which they characterize as an extraordinary duration for such an exam. *Id.*

Defendants oppose plaintiffs' application to be accompanied by a nurse observer, as well as the alternative relief plaintiffs seek. *See* ECF No. 28. They contend that there is nothing inherently adversarial about having each plaintiff examined alone by the defense psychologist. Further, they contend, with the support of an affidavit from their expert, Dr. Morgan, that permitting a nurse observer or audio-recording during the examination will adversely affect the scientific validity of the testing Dr. Morgan plans to administer to plaintiffs. Dr. Morgan emphasizes that the tests he plans to use to assess plaintiffs' condition must be given under standardized conditions in order to be valid. He cites literature in the field establishing that such conditions preclude third party observation, including the use of audiotaping, because it "can artificially alter an individual's task performance, and affect the reliability and validity of test scores." ECF No. 28-1 ¶¶ 7-18. Indeed, he sets forth in his affidavit that he "do[es] not know of any board certified psychologist/neuropsychologist in New Jersey or elsewhere who would agree to such unacceptable working conditions." *Id.* ¶ 6. He does offer, however, to provide plaintiffs

4

with "as many breaks as wanted in addition to regularly scheduled breaks" and to allow their observer "to situate himself or herself immediately outside the exam room over the course of the evaluation," where presumably the observer could speak with plaintiffs during breaks. *Id.* ¶ 28.

## B. Analysis

Federal Rule of Civil Procedure 35(a) governs physical or mental examinations of parties. It provides that "[t]he court where the action is pending may order a party whose mental or physical condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). That order "must specify the time, place, manner, conditions and scope of the examination, as well as the person or persons who will perform it." *Id.* (a)(2)(B).

The rule is silent as to the presence of outside observers during the examination and the recording of the examination. The Court has discretion to decide whether such presence is a proper "condition" of the examination, based on the information presented. *See R.D. v. Shohola Camp Ground & Resort*, Civ. No. 16-1056, 2017 WL 1036475, at *1 (M.D. Pa. Mar. 17, 2017); *Stoner v. New York City Ballet Co.*, Civ. No. 09-0196 (BSJ) (MHD), 2002 WL 31875404, at *5 (S.D.N.Y. Dec. 24, 2002). Once the right to take a Rule 35 examination has been established, the burden is on the party seeking the participation of an observer at the examination to demonstrate good cause for the third party's presence. *See Cristino v. Berkshire Life Ins. Co.*, Civ. No. 10-3506 (MLC) (DEA), 2011 WL 13151979, at *2 (D.N.J. Oct. 6, 2011); *R.D.*, 2017 WL 1036475, at *2-3; *Reyes v. City of New York*, Civ. No. 00-2300 (SHS), 2000 WL 1528239, at *3 (S.D.N.Y. Oct. 16, 2000).[3]

---

[3]    The Court is cognizant of the Superior Court of New Jersey's decision in *BD v. Carley*, 307 N.J. Super. 259, 262 (App. Div. 1998), which appears conversely to place the burden on the party seeking to exclude a third-party observer or preclude the recording of the examination. With

5

The Court notes that there is no controlling precedent in this Circuit on allowing the presence of a third party or a recording during a Rule 35 examination. As defendants point out, however, the "majority rule" in federal courts throughout this nation is to exclude outside observers from Rule 35 examinations. *See, e.g. R.D.*, 2017 WL 1036475, at \*2; *McKisset v. Brentwood BWI One LLC*, Civ. No. WDQ-14-1159, 2015 WL 8041386, at \*2 (D. Md. Dec. 4, 2015); *King v. Mansfield Univ. of Pa.*, Civ. No. 11-1112, 2014 U.S. Dist. LEXIS 17059, at \*6-7 (M.D. Pa. Feb. 11, 2014); *Newman v. San Joaquin Delta Cmty. Coll. Dist.*, 272 F.R.D. 505, 513-14 (E.D. Cal. 2011); *Calderon v. Reederei Claus-Peter Offen GmbH & Co.*, 258 F.R.D. 523, 526 (S.D. Fla. 2009).[4]

There is no dispute that plaintiffs' mental condition is in controversy because they seek damages from the defendants in this action as a result of their alleged emotional distress from the incident at issue in the lawsuit. Although plaintiffs thus do not object to appearing for their examinations by Dr. Morgan, they contend that there is good cause to allow them to be

_____

due respect for that state court decision, federal procedural law governs this federal question case, and the majority of federal authority places the burden on the party seeking the participation of the third-party observer to demonstrate special circumstances that justify it. *See Tarte v. United States*, 249 F.R.D. 856, 859 (S.D. Fla. 2008).

[4]     The Court does not view two other decisions of this Court, cited by plaintiffs, as contrary to the majority rule. In *Cristino v. Berkshire Life Ins. Co.*, Civ. No. 10-3506 (DEA), 2011 WL 13151979 (D.N.J. Oct. 6, 2011), the Court held that the plaintiff could not audio-record her examination. Although the Court permitted a nurse observer to be present during the examination, it noted the presence of a third-party observer was an issue upon which the parties had agreed and that therefore was not in dispute. *See id*. at \*2. Similarly, in *Muse-Freeman v. Bhatti*, Civ. No. 07-3638 (JJH), 2008 WL 2550663 (D.N.J June 20, 2008), the defendant did not oppose the plaintiff's application to have *an* observer present during the examination. Defendant's motion sought to preclude *plaintiff's expert* from observing, and the Court granted defendant's motion. *See id*. at \*2-\*3.

6

accompanied to the examinations by a nurse observer or their counsel, or alternatively to audio-record the examination sessions.

The Court is persuaded under the facts of this case that the examination of each plaintiff should be conducted without the presence of a nurse observer or plaintiffs' counsel, and without an audio-recording of the examination. Plaintiffs endeavor to justify the need for an observer at the examinations mainly on the grounds that the examinations will be "adversarial." Although the examination at issue will be taken by an expert hired by defendants to prepare a report for this litigation, plaintiffs present no support for their contention that the examinations will be "adversarial," or that they will be conducted for the purpose of "de facto deposing of the plaintiff by defendant's agent." ECF No. 26 at 4. Dr. Morgan explains in his affidavit that he intends to administer particular tests under standardized conditions in order to assess plaintiffs. ECF No. 28-1 ¶¶ 9-11, 18, 23, 28. He notes that "the test instruments that will be used to assess plaintiffs are the very same measures used to assess individuals across a wide range of legal and clinical venues." *Id.* ¶ 23. Dr. Morgan's detailed affidavit, describing his intention to employ commonly used and recognized scientific methods to examine the plaintiffs, satisfies the Court that he does not have in mind acting in anything less than a professional manner, under the independent professional standards for licensed psychologists. The Court will not lightly -- and certainly not without factual support -- assume that a professional will not conduct an examination under the standards his profession imposes. Plaintiffs further request that the Court permit the presence of a third party observer or a tape recorder to discourage hypothetical "abuse" by Dr. Morgan. The Court finds this purported concern similarly without basis.

7

Assuming a third-party nurse observer was present at the examination, the Court questions what appropriate role a third party observer would play. An objection to the manner in which the defense medical expert is conducting the examination would significantly undermine any rapport between the medical expert and the plaintiff being examined, impairing its integrity. *See* ECF No. 28-1 ¶¶ 26-28. And inviting such interference is rife with concerns about whether the third party nurse observer's objections would be well taken. In the Court's view, it is the prospect of *this* type of dynamic in the examination room that threatens to create an adversarial atmosphere more than simply the fact that an agent of the adverse party, who also has independent professional obligations, is conducting it.

An important focus of setting conditions for the Rule 35 examination is to promote the examination's objectivity and reliability. *See Shirsat v. Mutual Pharm. Co.,* 168 F.R.D. 68, 71 (E.D. Pa. 1996). Here, Dr. Morgan cites the purpose of the examinations as being "to determine whether plaintiffs sustained any neuropsychological and/or psychological injury as a result of a harassment incident on July 20, 2015." ECF 28-1 ¶ 3. Of course, plaintiffs may suffer from psychological conditions that are unrelated to and that may have preceded the events at issue in the Complaint, and the issue of whether the complained-of conduct is the cause of their conditions is also a proper focus of the examination. As Dr. Morgan stresses, "[u]nlike a physical examination, the psychological and neuropsychological interview involves a complex observational process that 'unfolds' within a particular type of interpersonal context. This process is intended to facilitate the open disclosure of information that often involves the most intimate details of a person's life, both positive and negative." *Id.* ¶ 25. He persuasively submits that the presence of third-party observers or recording devices is known to interfere with the expert's

8

ability to establish the necessary credibility and rapport with the parties being examined and would "artificially alter an individual's task performance, and affect the reliability and validity of test scores." *Id.* ¶¶ 15, 26. He also notes "research suggests that social facilitation [caused by third-party observation] can have the effect of causing an individual's deficits to appear significantly worse than they actually are and their strengths to appear significantly better than they actually are, resulting in inaccurate test data." *Id.* ¶ 16. The Court is convinced from Dr. Morgan's submission that not allowing outside observation will best ensure the integrity of the expert testing and process in this case.

To the extent plaintiffs seek to have an observer or audio-recording present for the purpose of having a witness to the manner in which the examination is conducted, there are other safeguards for ensuring that the Rule 35 examination is conducted fairly that allow plaintiffs to challenge the findings of the examination if it is not. As an initial matter, the presence of a third party to act as a witness seems to be superfluous given that plaintiffs themselves will have personal knowledge of how the examinations were conducted that they may share with their counsel. Moreover, by the ordinary operation of Federal Rule of Civil Procedure 35(b), Dr. Morgan is required to deliver to plaintiffs a copy of his report, which must include "in detail" his "findings, including diagnoses, conclusions, and the results of any tests." Fed. R. Civ. P. 35(b)(1), (2). Dr. Morgan may be cross-examined about these conclusions and plaintiffs may submit contrary expert evidence. *See Cristino*, 2011 WL 13151979, at *2. Given these procedural devices to challenge whether Dr. Morgan's findings and conclusions are well founded, the presence of an outside observer or the recording of the examination is not sufficiently necessary to justify the potential adverse effects of such participation or recording.

9

As for the proposed length of the plaintiffs' examinations, defendants' counsel persuades the Court that it is necessary and that there is no improper adversarial design behind the scheduling of a day for the psychological testing. Counsel notes that a battery of different tests is required to determine the veracity of each plaintiff's report of having suffered PTSD and other psychological injuries as a result of the conduct of defendants, as well as to determine the nature of their conditions. ECF No. 28 at 9-10. This is especially true of psychological, as opposed to physical conditions, where there are no objective tests such as x-rays or MRIs to make diagnoses. While undergoing such lengthy examinations may make plaintiffs anxious or uncomfortable, Dr. Morgan offers that they may take breaks as frequently as they desire. Of course, the examinations should be conducted as expeditiously as is consistent with sound scientific practice. But having placed their conditions in issue by seeking damages for PTSD and other alleged psychological injuries, the Court does not find it appropriate to truncate an examination that the defense views as necessary to determine the nature, severity and cause of plaintiffs' alleged psychological injuries.

## CONCLUSION

For the foregoing reasons, it is on this 4th day of April, 2018,

**ORDERED** that plaintiffs are precluded from having a nurse observer or their counsel present during their examinations by Dr. Morgan; and it is further

**ORDERED** that no recording device is to be used to record the examinations; and it is further

**ORDERED** that plaintiffs may take such breaks as are reasonably necessary and not unduly disruptive of their examinations; and it is further

**ORDERED** that the defense expert examinations shall be completed no later than **April 30, 2018**; and it is further

**ORDERED** that all expert depositions shall be completed on or before **June 29, 2018**; and it is further

**ORDERED** that the Court shall conduct a status telephone conference on **June 27, 2018, at 2:30 p.m.**

**Hon. Leda Dunn Wettre**
**United States Magistrate Judge**

11