UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CLINTON CATO and MARY JO CATO,<br><br>Plaintiffs,<br><br>v.<br><br>THE TOWNSHIP OF ANDOVER, et al.,<br><br>Defendants. | Case No. 16-4605 (SDW) (LDW)<br><br>**OPINION**<br><br>July 26, 2019 |

**WIGENTON**, District Judge.

Before this Court is Defendants Township of Andover (the "Township"), Andover Police Department (the "Andover PD"), Chief Eric C. Danielson ("Danielson"), Sergeant Brian E. Kithcart ("Kithcart"), Officer George I. Laoudis ("Laoudis"), and Officer Alex Price's ("Price") (collectively, "Defendants") Motion for Summary Judgment to dismiss Plaintiffs Clinton Cato ("Clinton") and Mary Jo Cato's ("Mary Jo") (collectively, "Plaintiffs") Complaint, pursuant to Federal Rule of Civil Procedure 56. This Court has jurisdiction over this action pursuant to 28 U.S.C §§ 1331 and 1367. Venue is proper pursuant to 28 U.S.C. § 1391. This motion is decided without oral argument pursuant to Federal Rule of Civil Procedure 78. For the reasons discussed below, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

I.  BACKGROUND AND PROCEDURAL HISTORY

Plaintiffs are an interracial couple who live in Andover Township, New Jersey. (Defs.' Statement of Material Facts ("SMF") ¶¶ 1, 4, ECF 44-2.)[1] Plaintiffs' relationship with their

---

[1] Clinton is African American, and his wife Mary Jo is Caucasian. (*Id.*)

neighbors George and Kimberly Morehouse ("George" and "Kimberly," respectively) "began to deteriorate[,]" such that between December 2010 and March 2014, the neighbors lodged roughly fifteen to sixteen complaints against each other with the Andover PD. (*Id.* ¶¶ 30, 38-39.) Following another dispute, Clinton pepper sprayed George in the face on July 20, 2015. (*See id.* ¶ 69.) Kimberly called 9-1-1 claiming that her husband had been shot in the face. (*Id.* ¶ 70.)

At approximately 10 p.m., Andover PD dispatched Defendants Kithcart, Laoudis, and Price to the scene of the incident.[2] (*Id.* ¶¶ 5, 70.) The officers found George on his front yard holding a white cloth over his left eye. (*Id.* ¶ 77.) George, Kimberly, and their friends James Dunnigan and Megan Shea repeatedly stated that Clinton had shot George in the face. (*Id.* ¶¶ 77-79.) Kithcart attempted to provide first aid before joining Price and Laoudis in front of Clinton's house. (*Id.* ¶ 82.) Upon observing Clinton either inside or in front of his garage, Laoudis instructed Clinton to turn around and walk backwards towards the officer's voice. (*Id.* ¶ 85; *see* Pls.' Resp. to Defs.' SMF ¶ 85, ECF No. 55.) Laoudis asked Clinton if he was armed, to which Clinton responded affirmatively; Clinton then complied with a request to place his handgun on the ground. (Defs.' SMF ¶¶ 87-89; *see also* Pls.' Resp. to Defs.' SMF ¶ 100.) Clinton continued to walk backwards as instructed and then laid down on the ground. (Defs.' SMF ¶¶ 90-91.) Right before he was cuffed, Clinton stated: "[E]asy how you pull my arms[,] I'm a handicapper," to which Kithcart replied: "[Y]ou just shot somebody, shut up." (*Id.* ¶ 91; *see also* Pls.' SMF ¶ 43, ECF No. 54.) Clinton was advised to "relax" as he protested that he had not shot anyone and that he had been threatened with a sledgehammer. (Defs.' SMF ¶¶ 92-95.) Kithcart proceeded to use two sets of handcuffs on Clinton. (*Id.* ¶¶ 98-99.)

---

[2] Laoudis requested assistance from other law enforcement agencies, including the Newton, Sparta Township, and New Jersey State Police Departments. (*Id.* ¶ 72.)

As Clinton continued to protest, Mary Jo came out of her house onto the front porch. (*Id.* ¶ 103.) Laoudis and another officer instructed her not to go back in the house. (*Id.* ¶ 104.) When she inquired as to why, the officers said she could be retreating to get another weapon. (*Id.* ¶ 105.) Laoudis then instructed Mary Jo to bring her son and daughter outside. (*Id.* ¶ 107.) Mary Jo and her children remained on the porch until approximately 2:00 a.m. after which time they were permitted to return inside with a police escort. (*Id.* ¶ 128.)

Defendant Danielson arrived on the scene at 10:17 p.m. (*Id.* ¶ 127.) He noted an "orange-like discharge" from George's left eye. (*Id.*) Following his interaction with George, Danielson experienced eye discomfort, which he relieved with a saline rinse. (*Id.*) Clinton was placed in the back of an Andover PD patrol car at 10:21 p.m., a few minutes after he was handcuffed. (*Id.* ¶¶ 111, 113.) At approximately 10:25 p.m., Clinton called out that he was "having a little problem" and complained of spasms. (*Id.* ¶ 113.) About thirteen seconds later, Clinton began moaning and calling out to the officers. (*Id.*) At 10:26 p.m., Clinton told Danielson that he had previously broken his neck and back, he was a "handicapper," and that he was having spasms. (*Id.* ¶ 114.) Danielson opened the car door but did not permit Clinton to leave the vehicle. (Pls.' Resp. to Defs.' SMF ¶ 114; *see also* Defs.' Resp. to Pls.' SMF ¶ 44, ECF No. 59-1 (explaining that Danielson allowed Clinton to "swing his legs outside the vehicle").) Approximately twenty-five minutes later, Clinton advised officers: "I'm in massive pain here, not that you guys care, I'm handicapped." (Pls.' SMF ¶ 45.)

Between 11:16 p.m. and 11:25 p.m., Clinton was transported to the Andover Township Police Station where he was later interviewed. (Campi Cert. Ex. G, Mosner dashcam 23:16-23:25, ECF No. 51-7; Seelagy Cert. Ex. K, ECF No. 44-14.) He provided written consent, permitting law enforcement to view his home surveillance videos and search his vehicle, which contained a "Kimber Pepper Blaster." (Defs.' SMF ¶¶ 136-37, 140; *see also* Seelagy Cert. Ex. EE, ECF No.

44-34.) At approximately 3:43 a.m., officers escorted Clinton home where they viewed his surveillance videos. (Defs.' SMF ¶ 139; *see also* Seelagy Cert. Exs. F at 2, Q at 2, R at 3, ECF Nos. 44-9, -20, -21.) The officers decided not to file charges and Clinton was released in his home at about 4:32 a.m. (Seelagy Cert. Exs. F at 2, Q at 2, R at 3.)

On July 29, 2016, Plaintiffs filed an eighteen-count Complaint against Defendants asserting civil rights violations under the U.S. Constitution, the Constitution of the State of New Jersey, and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1 *et seq*. (ECF No. 1.)[3] Following a period of discovery, Defendants moved for summary judgment on December 28, 2018. (ECF No. 44.) On January 22, 2019, Plaintiffs opposed the motion and Defendants replied on January 28, 2019. (ECF Nos. 50-56, 59.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical

---

[3] The Complaint also included claims against the Township of Newton, the Newton Police Department, and Chief Michael Richards (the "Newton Defendants"). (*Id.*) On October 11, 2017, this Court so ordered Plaintiffs' stipulation of dismissal against the Newton Defendants. (ECF No. 21.) As such, Counts Thirteen through Sixteen are no longer at issue.

4

doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325), *abrogated on other grounds by Rotkiske v. Klemm*, 890 F.3d 422 (3d Cir. 2018). Further, the nonmoving party is required to "point to concrete evidence in the record which supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322-23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by

asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002).

## III. DISCUSSION

42 U.S.C. § 1983 provides in relevant part:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

Section 1983 does not itself create any rights, it merely provides "private citizens with a means to redress violations of federal law committed by state [actors]." *Woodyard v. Cty. of Essex*, 514 F. App'x 177, 180 (3d Cir. 2013); *see also Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Similarly, "civil claims for violations of the New Jersey Constitution can only be asserted by way of the [NJCRA]." *Martin v. Unknown U.S. Marshals*, 965 F. Supp. 2d 502, 548 (D.N.J. 2013). Because the NJCRA is "interpreted analogously to Section 1983," Plaintiffs' state constitutional claims will also be analyzed under § 1983. *O'Toole v. Klingen*, No. 14-6333, 2017 WL 132840, at *5 (D.N.J. Jan. 13, 2017); *see also Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011) (noting that the NJCRA "was modeled after . . . § 1983").

To bring a § 1983 claim, a plaintiff must prove "(1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Schneyder v. Smith*, 653 F.3d 313, 319 (3d Cir. 2011); *Hilton v. Whitman*, No. 04-6420, 2008 WL 5272190, at *4 (D.N.J. Dec. 16, 2008) (noting that the plaintiff must "identify the exact contours of the underlying right said to have been violated.").

A. *Monell* Claim Against the Township (Count One)[4]

Generally, a public entity is not liable under § 1983 for the actions of its employees unless the injury results from the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978). A policy or custom can be established where:

> (1) the entity or supervisor promulgates an applicable policy statement and the act the plaintiff complains of is the implementation of that policy; (2) the policymaker, without a formally announced policy, violates federal law itself; or (3) . . . "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of [the] existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."

*Defreitas v. Montgomery Cty. Corr. Facility*, 525 F. App'x 170, 177 (3d Cir. 2013) (quoting *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)). "Where the policy concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to deliberate indifference to the rights of persons with whom those employees will come into contact." *Shuman v. Raritan Twp.*, No. 14-3658, 2016 WL 7013465, at *18 (D.N.J. Nov. 30, 2016) (citations and internal quotation marks omitted). Deliberate indifference is a demanding standard that requires "proof that a municipal actor disregarded a

---

[4] Plaintiffs bring § 1983 claims against both the Township in Count One and Andover PD in Count Two. (Compl. ¶¶ 97-112.) However, as Plaintiffs acknowledge in their opposition brief, the Andover PD "is a mere administrative arm and not a separate entity for purposes of a § 1983 action." (Pls.' Opp'n Br. at 41, ECF No. 50); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989); *Briggs v. Moore*, 251 F. App'x 77 (3d Cir. 2007); *Padilla v. Twp. of Cherry Hill*, 110 F. App'x 272, 278 (3d Cir. 2004). As such, Defendants' motion for summary judgment is granted as to Count Two because the police department "is indistinguishable as an entity from the Township," (Pls.' Opp'n Br. at 42), and because Plaintiffs assert similar claims against the Township in Count One.

known or obvious consequence of his action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citations omitted).

Here, Plaintiffs have not proffered evidence that the Township or its police department had a policy or custom that caused a violation of Plaintiffs' constitutional rights. *See Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990) ("Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."); *see also Bocchino v. City of Atl. City*, 179 F. Supp. 3d 387, 400 (D.N.J. 2016) ("[T]he deficiency in training [must have] actually caused the constitutional violation" (quoting *Thomas v. Cumberland Cty.*, 749 F.3d 217, 222 (3d Cir. 2014))). Though Mary Jo appeared at a Township Committee Meeting in November 2014 to apprise the municipality of her ongoing issues with her neighbors, there is nothing in the record to suggest that the Township had a "custom of tolerance" for unequal treatment. (*See* Pls.' Opp'n Br. at 6-7.) Furthermore, while it may have been "good practice" to designate the driveway Plaintiffs shared with their neighbors as an "increased patrol location," there is no evidence to support the allegation that the Township's "*deliberate* conduct . . . was the 'moving force' behind the injury alleged." *Reitz v. Cty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997). Therefore, Defendants' motion for summary judgment is granted as to Plaintiffs' *Monell* claim in Count One.

B. <u>Constitutional Claims Against the Individual Defendants[5] (Counts Three through Ten)</u>

  i. *Clinton's False Arrest & False Imprisonment Claims*

To state a claim for false arrest under the Fourth Amendment, which protects persons from unreasonable searches and seizures, "a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *James v. City of Wilkes-Barre*, 700 F.3d 675,

---

[5] Danielson, Kithcart, Laoudis, and Price will collectively be referred to as the "Individual Defendants."

8

680 (3d Cir. 2012); *see also* U.S. Const. amend. IV; *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 913 (2017) ("This Court decided some four decades ago that a claim challenging pretrial detention fell within the scope of the Fourth Amendment."). In the instant matter, it is undisputed that Clinton was arrested and detained. (Defs.' SMF ¶¶ 109, 111.) However, the parties disagree as to whether the Individual Defendants had probable cause to arrest Plaintiff.[6]

"Generally, the existence of probable cause is a factual issue." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 635 (3d Cir. 1995) (citing *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 191 (3d Cir. 1984)). To determine whether probable cause exists, courts take a "common sense approach" based on the "totality of the circumstances." *Goodwin v. Conway*, 836 F.3d 321, 327 (3d Cir. 2016) (internal quotation marks omitted) (citing *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000)). Probable cause "exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been . . . committed by the person to be arrested." *Id.* (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 483 (3d Cir. 1995)); *see also Sharrar v. Felsing*, 128 F.3d 810, 817-18 (3d Cir. 1997) (abrogated on other grounds).

Here, Plaintiffs have raised genuine issues of material fact as to whether the officers had probable cause to believe that George had been shot at the time Clinton was arrested. Specifically, Plaintiffs argue that based on Kithcart's training and willingness to forgo first aid, he knew almost immediately that the shooting allegation was false. (*See* Pls.' Opp'n Br. at 13-14; *see also* Pls.' Resp. to Defs.' SMF ¶ 80.) In particular, Plaintiffs point to Kithcart's testimony that he went to see if George was "actually shot" and though the officer stated that there was "red fluid[,]" he determined that George's injuries "could wait for the ambulance and . . . left[.]" (Campi Cert. Ex.

---

[6] This Court notes that the parties also dispute whether Clinton was arrested inside or outside of his home. (Defs.' SMF ¶ 85; Pls.' Resp. to Defs.' SMF ¶ 85.)

C, 77:14-78:5, ECF No. 51-3.) Plaintiffs have also presented evidence to suggest that Danielson was aware George was pepper sprayed because he complained of and treated his own eye irritation after examining George's injuries. (Pls.' Resp. to Defs.' SMF ¶ 127.) What the Individual Defendants knew and when they knew it are questions of fact and credibility for the jury.

Because Clinton's false arrest claim is not ripe for summary judgment, neither is his claim for false imprisonment. *See O'Connor v. City of Phila.*, 233 F. App'x 161, 164 (3d Cir. 2007) (citations omitted) ("[W]here the police lack probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest."). Therefore, Defendants' motion is denied with respect to Clinton's false arrest and false imprisonment claims in Counts Three through Ten.

### ii. Clinton's Conspiracy Claims

Clinton alleges that Defendants conspired to falsely arrest and imprison him, and to "depriv[e] [him] . . . of his right to equal protection under the law."[7] (Compl. ¶¶ 115-16, 123-24, 129, 131, 138, 147, 154, 162, 168.) It is well settled that a conspiracy requires a "meeting of the minds." *Startzell v. City of Phila.*, 533 F.3d 183, 205 (3d Cir. 2008)); *see also Korlewala v. Slobodian*, 712 F. App'x 148, 150 (3d Cir. 2017) ("Conspiracy to commit false arrest requires an agreement between multiple individuals to deprive another of his Fourth Amendment rights.").

Here, Plaintiffs have presented evidence to suggest that the Individual Defendants came to an agreement to search Clinton's property and seize his guns despite knowing that George had not been shot. Specifically, Laoudis' dashcam footage at approximately 10:22 p.m. captures officers stating: "Problem is his house has gotta be loaded with guns, do you know?" (*See* Pls.' SMF ¶ 21; *see also* Campi Cert. Ex. G, ECF No. 51-7.) Another responds: "Hell yeah"; followed by: "Get

---
[7] This Court notes that Defendants' briefs only address the false arrest and false imprisonment conspiracy allegations. (*See* Defs.' Reply Br. at 6, ECF No. 59.)

'em all." (Pls.' SMF ¶ 21.)[8] Plaintiffs allege that this conversation took place after officers were already aware that a firearm had not been used. (Pls.' Opp'n Br. at 27.)

Additionally, Plaintiffs reference officers' descriptions of the liquid found on George's head to show that the Individual Defendants were "acting in concert and using [a] disproven initial allegation . . . as a pretext to deprive [Plaintiffs] of their constitutional rights[.]" (*Id.*) In particular, New Jersey State Police officers described the substance as "orange colored . . . not consistent with blood." (Seelagy Cert. Ex. M at 2, ECF No. 44-16; *see also* Campi Cert. Ex. J, 27:9-10, 31:25-32:4, ECF No. 52-2.) In contrast, Danielson described it as "blood mixed with sweat or some other type of liquid." (Seelagy Cert. Ex. H at 1, ECF No. 44-11.) Similarly, Kithcart noted that the rag on George's face appeared to be "covered in blood" and that he and Laoudis had "observed what appeared to be blood spatter on a vehicle parked in [Clinton's] driveway." (Seelagy Cert. Ex. I at 1, ECF No. 44-12; *see also* Campi Cert. Ex. C, 97:1-6, ECF No. 51-3.) Viewing the facts in the light most favorable to the non-movant, a reasonable jury could discern a meeting of the minds and concerted action from the evidence presented. Moreover, there remain issues of fact as to when the officers became aware that George had not been shot with a gun. As such, Defendants' motion is denied as to Plaintiffs' conspiracy claims in Counts Three through Ten.

      iii.   *Clinton's Excessive Force, Assault, Battery, & Deliberate Indifference Claims*

"The use of excessive force is itself an unlawful 'seizure' under the Fourth Amendment." *Couden v. Duffy*, 446 F.3d 483, 496 (3d Cir. 2006) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989); *Carswell v. Borough of Homestead*, 381 F.3d 235, 240 (3d Cir. 2004)). Thus, to determine whether the challenged conduct amounts to a constitutional violation, courts apply the Fourth

---

[8] Defendants contend that it is unclear whether Andover PD or other state troopers at the scene made the statements. (Defs.' Resp. to Pls.' SMF ¶ 21.)

11

Amendment's "objective reasonableness test," which is a "highly individualized and fact specific" inquiry. *Santini v. Fuentes*, 795 F.3d 410, 417 (3d Cir. 2015).

The Supreme Court has articulated three factors that must be considered in evaluating whether the use of force was reasonable: (i) "the severity of the crime at issue"; (ii) "whether the suspect pose[d] an immediate threat to the safety of the officers or others"; and (iii) "whether [the suspect] actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Graham*, 490 U.S. at 396. The Third Circuit expanded this inquiry to include "the possibility that the persons subject to the police action are themselves violent or dangerous, the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Sharrar*, 128 F.3d at 822 (abrogated on other grounds). Additionally, a court must "evaluate objective reasonableness from the perspective of the officer at the time of the incident and not with the benefit of hindsight." *Santini*, 795 F.3d at 417; *see also Curley v. Klem*, 499 F.3d 199, 206-07 (3d Cir. 2007).

Here, Plaintiffs allege that excessive force was used in handcuffing Plaintiff for a prolonged period of time despite his protestations of being in pain. As discussed above, Plaintiffs have proffered evidence to suggest that the Individual Defendants were aware at the outset that George had been pepper sprayed rather than shot. Thus, there are issues of fact as to the severity of the crime at issue, which also bears on whether Clinton posed an immediate threat as a purported "active shooter." (*See* Defs.' SMF ¶ 83; Pls.' Resp. to Defs.' SMF ¶ 83.) It is undisputed, however, that Clinton neither resisted nor attempted to evade arrest. (*See* Seelagy Cert. Ex. I at 1 (noting that at the time Clinton was being handcuffed, he "was not combative or resisting").) Rather, he fully cooperated during the arrest and ensuing police investigation. (*See id*; *see also* Seelagy Cert. Exs. Q at 2, R at 3.) He also truthfully informed officers that he had weapons and he complied

with instructions to remove them from his person. (*See* Defs.' SMF ¶¶ 87-89.) Although a police report notes that Clinton was uncuffed once he was taken to Andover Police Station's processing room, (Seelagy Cert. Ex. K at 1), it is unclear exactly how long Clinton was handcuffed and experiencing spasms. Additionally, the parties dispute whether two handcuffs were used to accommodate Clinton's handicap or if Kithcart was simply unable to use one pair of cuffs because of Clinton's limited range of motion. (*Compare* Defs.' SMF ¶ 99 *with* Pls.' SMF ¶ 44.) Viewing the facts in the non-movant's favor, a reasonable jury could find that the force used against Clinton was excessive considering his overall cooperation and repeated verbal reminders that he was handicapped and in pain. As such, Defendants' motion for summary judgment is denied as to Clinton's excessive force claims against Kithcart in Counts Five and Six. However, because Kithcart was the only officer who handcuffed Clinton, summary judgment is granted as to the excessive force claims against Laoudis in Counts Seven and Eight.[9]

Because Clinton's excessive force claims against Kithcart are not ripe for summary judgment, neither are his claims for assault and battery. *See Panarello v. City of Vineland*, 160 F. Supp. 3d 734, 767 (D.N.J. 2016) ("A police officer may use such force as is reasonably necessary to effect an arrest, but once the force becomes excessive, the officer may be liable for assault and battery." (citations omitted)); *see also Groman*, 47 F.3d at 634 ("Police officers are privileged to commit a battery pursuant to a lawful arrest, but the privilege is negated by the use of excessive force." (citations omitted)). Therefore, Defendants' motion is denied with respect to Clinton's assault and battery claims in Counts Six.[10]

---

[9] Laoudis is also granted summary judgment as to the related assault and battery claims in Count Eight.
[10] This Court will briefly address Defendants' argument that Clinton's assault and battery claims against Kithcart should be dismissed because Plaintiffs failed to file a notice of claim pursuant to the New Jersey Tort Claims Act ("TCA"). (Defs.' Moving Br. at 43.) Generally, a plaintiff asserting a tort claim against a "public employee must provide notice of his claim no later than ninety days after the claim has accrued." *Turner v. N.J. State Police*, No. 08-5163, 2017 WL 1190917, at *35 (D.N.J. Mar. 29, 2017) (citing N.J. Stat. Ann. § 59:8-8). However, this notice requirement does not apply to causes of action brought under the NJCRA. *Owens v. Feigin*, 947 A.2d 653, 654 (N.J.

Plaintiffs also allege that Danielson, Kithcart, and Laoudis violated Clinton's Eighth Amendment rights because they were deliberately indifferent to his pain when they handcuffed him behind his back and left him in the patrol car despite knowing he was handicapped and spasming. (Compl. ¶¶ 114, 128, 146; Pls.' Opp'n Br. at 28-30.) The "Eighth Amendment Cruel and Unusual Punishments Clause does not apply until an inmate has been both convicted of and sentenced for his crimes." *Norman v. Haddon Twp.*, No. 14-6034, 2017 WL 2812876, at *5 (D.N.J. June 29, 2017). As a pre-trial detainee, Clinton's claims of deliberate indifference are more appropriately brought under the Fourteenth Amendment. *Id.* (citing *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012)); *see also Groman,* 47 F.3d at 637 ("Failure to provide medical care to a person in custody can rise to the level of a constitutional violation under § 1983 only if that failure rises to the level of deliberate indifference to that person's serious medical needs.").

To determine whether officers have violated an arrestee's constitutional rights by delaying medical care to an individual in custody, courts have applied a "two-pronged test requiring that plaintiff prove: (1) that his medical needs were objectively serious and (2) that defendant exhibited deliberate indifference to those needs." *Mantz v. Chain*, 239 F. Supp. 2d 486, 504 (D.N.J. 2002); *see also Norman*, 2017 WL 2812876, at *5-6. Here, Plaintiffs point to dashcam recordings to demonstrate that officers were aware, but indifferent to Clinton's pain. Specifically, at 10:27 p.m., Danielson opens the door to the patrol car to let Clinton swing his legs out but tells him: "I really don't care." (Campi Cert. Ex. G, Laoudis dashcam 22:27:49.) More than twenty minutes later, other officers respond to Clinton's cries with: "Same thing he was complaining about before" and

---

2008); *see also Cty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159 (3d Cir. 2006) (explaining that TCA notice requirements "do not apply to federal claims, including § 1983 actions . . . or to state constitutional torts" (citations omitted)). To the extent that Plaintiffs have raised common law tort claims, they would be dismissed for failure to comply with the TCA. However, because Plaintiffs have brought their state claims under the NJCRA as civil rights violations, those claims are not subject to the procedural notice requirements set forth in the TCA.

"Alright [sic], just hold on for now." (Campi Cert. Ex. G, Laoudis dashcam 22:49:57.) There are issues of fact as to who knew Clinton was in pain, how much distress he was in, and whether the officers' behavior was reasonable. Based on the foregoing, summary judgment is premature as to Clinton's deliberate indifference claims against Danielson, Kithcart, and Laoudis in Counts Five through Eight.

> iv. *Mary Jo's Claims of False Detention, Deprivation of Liberty and Freedom of Movement*

"Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968). "An actual physical touching is not required to constitute a seizure of a person, but in the absence of a physical touching, there must be a submission to an officer's show of authority." *Black v. Montgomery Cty.*, 835 F.3d 358, 365 (3d Cir. 2016) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)). "As a corollary, the deprivation or restraint of a person's liberty may be physical, or it may be that 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.'" *Id.* (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)).

Here, Defendants contend that Mary Jo was not "seized" under the Fourth Amendment because she was "free to go anywhere she wanted, with the limited exception of returning inside the home." (Defs.' Moving Br. at 37.) However, courts have explained that "circumstances indicating a seizure might include 'the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Black*, 835 F.3d at 365 (quoting *Mendenhall*, 446 U.S. at 554). Though Mary Jo was not physically confined to her porch or told that she could not leave her property, Plaintiffs have submitted

15

evidence that when Mary Jo came out of her home, she was instructed to stay on the porch and an officer physically stopped her from retrieving a surveillance camera from the roof of her car. (*See* Campi Cert. ¶ 29, ECF No. 51; Pls.' SMF ¶ 28; Campi Cert. Ex. K, 170:1-25, ECF No. 52-3.) Afterwards, Mary Jo and her children were instructed to remain on the porch where they remained until approximately 2:00 a.m. at which time they were permitted to return inside with a police escort. (*See* Defs.' SMF ¶ 128; Pls.' Resp. to Defs.' SMF ¶ 128; Campi Cert. Ex. M, 121:2-5, 144:3-6, ECF No. 53-2.) Based on the foregoing, a reasonable jury could find that Mary Jo did not believe she was free to leave, and thus was "seized" under the Fourth Amendment.

Defendants argue in the alternative that even if Mary Jo had been "seized," her detention was lawful because it was meant "to ensure officer safety and the preservation of evidence[.]" (Defs.' Moving Br. at 39.) This argument, however, is predicated on the officers' reasonable belief that Clinton shot George. As discussed above, there are triable issues of fact regarding whether the officers had probable cause to believe that George had been shot and when they became aware he had been pepper sprayed. Thus, Defendants' motion for summary judgment is premature as to Mary Jo's claims of false detention, deprivation of liberty and freedom of movement, as articulated in Counts Three through Ten.

> *v. Clinton & Mary Jo's Claims of Deprivation of Equal Protection of the Law*

"The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976). "To make an equal protection claim, a plaintiff must prove that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." *Beatty v. Twp. of Elk*, No. 08-2235, 2010 WL 1493107 (D.N.J. Apr. 14, 2010) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977)).

To prove discriminatory effect, Plaintiffs must be able to show that they are members of a protected class and were treated differently from similarly situated individuals in an unprotected class. *Bradley v. United States*, 299 F.3d 197, 206 (3d Cir. 2002) (citations omitted). Here, Plaintiffs are an interracial couple who have mixed-race children. Plaintiffs contend that on the day of the incident, the Defendants "took the easily discredited lies" of George, Kimberley, and their friends, who are all Caucasian, over the "easily verified truths" from Clinton and Mary Jo, an interracial couple. (Pls.' Opp'n Br. at 40.) In further support of their claim of disparate treatment, Plaintiffs point to evidence that George's witnesses, who are Caucasian, were permitted to "confer on their statements, . . . speak with each other at will and leave the scene" whereas Mary Jo and her children were detained and not permitted to speak with one another. (Pls.' Opp'n Br. at 38-39; *see also* Campi Cert. ¶ 31, ECF No. 51; Pls.' SMF ¶¶ 28, 30; Campi Cert. Ex. G, Price dashcam 22:38:20-22:39:18.) Plaintiffs also contend that the Individual Defendants ignored exculpatory evidence, namely that Clinton's handgun "did not appear to be recently fired." (Pls.' SMF ¶ 31; *see also* Seelagy Cert. Ex. M at 2.) Despite Clinton's protestations that he had been threatened with a sledgehammer, officers did not search for the alleged weapon. (Pls.' SMF ¶ 31.) Furthermore, evidence of pepper spray on paper towels used to wipe George's face were not saved as evidence, but instead were found in the garbage by New Jersey State Police. (*Id.*; *see also* Seelagy Cert. Ex. M at 2.) Viewing the facts most favorably to Plaintiffs, a reasonable jury may be able to infer a discriminatory effect and purpose from the disparate treatment. As such, Defendants' motion for summary judgment is premature as to Clinton and Mary Jo's claims that they were deprived of equal protection of the law, as articulated in Counts Three through Ten.

### vi. *Qualified Immunity*

The doctrine of qualified immunity shields government officials from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known." *Santini*, 795 F.3d at 417 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal quotation marks omitted)); *see also Brown v. State of New Jersey*, 165 A.3d 735, 743 (N.J. 2017) (explaining that New Jersey's qualified immunity doctrine tracks the federal standard). To determine whether a defendant is entitled to qualified immunity, a court must "decide whether the facts that a plaintiff has . . . shown . . . make out a violation of a constitutional right." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In addition, the court must "decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id.*[11] If the answer to either question is "no," the analysis may end, and immunity applies. *Gardner v. N.J. State Police*, No. 15-08982, 2018 WL 5342715, at *7 (D.N.J. Oct. 29, 2018) (citing *Pitman v. Ottehberg*, No. 10-2538, 2015 WL 6445872, at *6 (D.N.J. Oct. 23, 2015)).

Generally, the applicability of qualified immunity is a question of law. *Hill v. Algor*, 85 F. Supp. 2d 391, 401 (D.N.J. 2000) (citing *Sherwood v. Mulvihill*, 113 F.3d 396, 401 n.4 (3d Cir. 1997)). "However, where factual issues relevant to the determination of qualified immunity are in dispute, the Court cannot resolve the matter as a question of law." *Id.* (citing *Karnes v. Skrutski*, 62 F.3d 485, 491 (3d Cir. 1995)); *see also Santini*, 795 F.3d at 420; *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002) ("Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis."); *Norman*, 2017 WL 2812876, at *6.

This Court does not find the Individual Defendants' qualified immunity arguments to be persuasive. *See, e.g.*, *Boyd v. City of Jersey City*, No. 15-0026, 2018 WL 2958468, at *8 (D.N.J.

---

[11] Judges may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 236; *see also Giles v. Kearney*, 571 F.3d 318, 325 (3d Cir. 2009).

June 13, 2018) (finding that the defendants did not meet their initial burden of proving entitlement to qualified immunity where their arguments were "vague, undetailed, and unsupported"). Moreover, as discussed above, there remain issues of fact as to whether the Individual Defendants knowingly violated Plaintiffs' constitutional rights. These disputed facts are intertwined with this Court's determination as to whether Plaintiffs' rights were clearly established. *See, e.g.*, *Norman*, 2017 WL 2812876, at *6. As such, summary judgment based on qualified immunity is denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED in part and DENIED in part**. An appropriate Order follows.

s/ *Susan D. Wigenton*_____<br>
**SUSAN D. WIGENTON**<br>
**UNITED STATES DISTRICT JUDGE**

Orig:       Clerk
cc:        Hon. Leda D. Wettre U.S.M.J.
            Parties